## HANNAH *et al.*

### *v.*

### WOODSON.

(*Supreme Court of Appeals of Virginia, Nov. 19, 1896.*)

[25 S. E. Rep. 1014.]

**Specific Performance—Parol Contract—Sufficiency of Evidence to Establish—Case at Bar.**

An agreement by decedent to give to plaintiff, a negress and his natural child, $10,000 and 25 acres of land, in consideration that plaintiff should keep house for him during his life, is not sufficiently shown by the testimony of plaintiff, corroborated by that of two negro witnesses to the alleged agreement, who at the time of the agreement were only 13 and 15 years old, and by the testimony of a negro that decedent, when he returned with plaintiff, told him of the agreement, where the other evidence showed that decedent paid regular wages to plaintiff while she worked for him; that plaintiff, during the 23 years she lived with decedent, never mentioned the agreement to any one, and that after decedent's death she spoke of her luck in having received from decedent, before his death, a deed to a small house and lot, as otherwise she would have received nothing; and that a negro man and woman who were present at the time of the alleged agreement, and who were shown to have been of good character, were not called as witnesses.

Suit by Mary W. Woodson against one Hannah, administrator, and others. There was a judgment for complainant, and defendants appeal. Reversed.

CARDWELL, J., delivered the opinion of the court.

· This is a suit instituted in the circuit court of Roanoke county by the appellee, Mary Woodson, against the appellant, the personal representative and heirs of William M. Utz,

deceased, for the specific performance of a parol' contract alleged to have been made and entered into between Utz and the appellee in the year 1867. The case is as follows : Utz, a bachelor and slave owner, about the beginning of the late war removed from Culpeper county to Roanoke county, and resided in the latter county, upon the estate known as "Waverly," owned by himself and his father jointly, until his death, on the 6th day of February, 1890. Among the slaves owned by Utz, and carried with him to Waverly, was the appellee, who at that time was about 10 years of age. In the spring of 1866, Lewis Daingerfield and other former slaves of Utz returned to Culpeper county to live ; the appellee going with them, but promising Utz to return to Waverly in a short time. Failing to return, Utz, about March, 1867, went to Culpeper, and carried her back to Waverly, where she lived in the capacity of a servant, cooking and doing other work about the premises, until the death of Utz. In the meantime the appellee was twice married ; was divorced from her first husband, and raised a family of children by her second husband at Waverly. About 10 years prior to the death of Utz, he built a house on the outer edge of the Waverly farm, which was occupied by the family of the appellee ; and on the day before his death Utz conveyed this house, together with $7\frac{4}{5}$ acres of land, to her, by a deed which was delivered to her at the time it was executed by Utz, and in the presence of the officer who took the acknowledgment. Subsequent to Utz's death, the appellee instituted a common-law suit in the circuit court of Roanoke county against the personal representative of Utz to recover the sum of $10,000, and the value of 25 acres of land, which she alleged was due to her by reason of a contract made and entered into with her by Utz in March, 1867, and which he had failed to perform ; but the plaintiff in this action took a nonsuit, and afterwards instituted this suit in equity. The contract alleged in her bill is that Utz agreed "that if she would go back with him [Utz] to his home, become his housekeeper, and take upon

herself the care and management of his household, and continue
in that capacity during his life, he would give her a house and
lot in his lifetime, near his residence, and at his death would
give her 25 acres of land adjoining the house, $10,000 in money,
and his household furniture.'' The bill alleges, also, that she
was at that time about 17 years of age, and did return with
Utz to his home, became his housekeeper, and took upon her-
self the care and management of his household, and so remained
and continued until the death of Utz. It is further alleged that
the appellee is the natural child of Utz, and that he did build
for her a house about a quarter of a mile from his residence,
and, a short while before his death, executed a deed to her,
conveying seven acres of land, upon which the house is situated,
but, dying unexpectedly, he did not comply with his prom-
ises and undertaking, except in conveying the house and lot,
which was only a part compliance, while she, on her part, fully
performed the alleged contract. The personal representative
and heirs of Utz demurred to the bill, and filed their answer,
denying every material allegation, and averring that, instead of
such a contract having been made, the appellee was paid by
Utz monthly wages for her services, up to the time of his death,
and that he had conveyed to her, as a gift, the house and lot,
with the $7\frac{5}{8}$ acres of land attached. The circuit court of
Roanoke county overruled the demurrer, and, upon the hear-
ing of the cause upon its merits, held that the contract with
Utz, as set out in the bill, had been proven, and that the com-
plainant was entitled to a specific execution of the contract for
the real estate, and for the money specified to be paid upon
the death of Utz, and decreed accordingly. From this decree
an appeal was taken to this court.

The appeal may be disposed of upon the merits of the cause,
without a review of the numerous authorities cited by counsel
in support of the demurrer to the bill. Appellee's proof upon
the main question consists of her own deposition, to which no
objection was made until the conclusion of her examination,

which was too late, and the deposition of John Daingerfield, Sarah E. Tyler, Ben Sims, and Robert T. Goodman. John Daingerfield was at the time of the making of the alleged contract, 25 years previous to his examination, only 13 years of age, and his sister Sarah E. Tyler but a few years older. According to the testimony of appellee, when Utz came to Culpeper for her, he found her 20 miles away from the home of Lewis Daingerfield, and took her up behind him, on horseback, and carried her to Lewis Daingerfield's house, arriving there about dark, where they spent the night in the cabin with Lewis Daingerfield and his family, and the family of his son-in-law, Tyler ; that the contract was made and entered into that night in the presence of Tyler, Daingerfield, and their respective wives and children ; that she (the appellee) was very averse to returning to Roanoke, but on being persuaded by Lewis Daingerfield, and others present, she consented to go ; and that the following morning Utz took her on his horse, behind him, and carried her 12 miles, to Culpeper Courthouse, where they took the train for Roanoke. Her statement is that Utz was very much opposed to her marrying a fellow by the name of Jewell, and assured her that "he would do better by her than the fellow, Jewell," and he agreed that, if she would go back with him, he (Utz) would, when he got home, build her a house upon any site that she might pick out anywhere on the outer edge of the farm, and give her the house and lot during his lifetime, and at his death would give her 25 acres adjoining the house and lot, $10,000 in money, and his household furniture, provided she stayed with him and kept house for him. John Daingerfield and Sarah E. Tyler deposed to the same effect ; both of them, however, saying that the house and lot was to be on the outer edge of the farm, while the bill alleges that it was to be "near his residence." Ben Sims, the other witness to this contract, testifies that he was at the depot at the station, now Roanoke city, when Utz arrived there with the appellee ; that he walked home with Utz, and, in a conversation with him, Utz told wit-

ness of the contract,—the witness adding only to what the other witnesses testified was the contract, that the house and lot were to be "anywhere she picked a place." Goodman's testimony is to the effect that 10 or 11 years prior to Utz's death, when he was building the house for the appellee, Utz told him that the house was being built for her, and pointed out the land which he intended to give her; but the witness could describe land only by a diagram which he had drawn. He says that Utz spoke of the land as being about 20 or 25 acres, but the witness does not testify that Utz told him of any contract or agreement whatever between appellee and Utz. He only testified that Mr. Utz told him that he intended to give her the land, of which the 7⅞ acres conveyed to her by deed executed the day before his death was a part, and contained the house which Goodman built. The other witnesses examined for appellee do not testify as to any contract made by Utz with the appellee, except Julia Davis, her daughter, whose testimony, in effect, is that, some four or five years prior to Utz's death, she was present at a conversation between Utz and the appellee relative to Mrs. Hannah's moving there to live with Mr. Utz, and that she heard him say something about a bargain; but she does not mention to what bargain reference was made. She says only that her mother said "Mrs. Hannah's moving there did not make any difference to her, provided it did not interfere with her business and the bargain." To which said Utz said, "No." The other witnesses testify mainly upon the question whether or not the appellee was in fact Utz's natural child.

On the other hand, the proof is that the appellee lived with Utz in the capacity of a servant; that he paid her wages, charging her with what she received from him and what he paid out for her, and refused, on a number of occasions, to pay money for her until it became due to her for wages. She attempts, however, to show that he only paid her wages for cooking after the family of Mrs. Hannah came to live in the house with Utz, some five years before he died; but the proof

is that he was paying her wages prior to that time, as he was paying other servants on the place. It further appears that the appellee, on the day before Utz's death, sent for Goodman, who was a justice or a notary, to come to the house of Utz and attend to some business for her ; that Goodman went, and on arriving there, he was told by Utz, in the presence of appellee, her husband, and their children (all of whom were in Utz's room when Goodman arrived), that appellee had been "cutting up," and had sent for him (Goodman) that morning. The witness Goodman further says, "He told me this when I went in," and Utz then brought out the deed and acknowledged it before him (Goodman), which deed, conveying the land, with the house on it, in which the appellee lived, was then and there delivered to her ; and not one word further was said by her as to any additional claim she had against Utz, and witness "never heard of any more cutting up." An effort was made to show by this witness that the appellee carried the keys belonging to Utz, but on cross-examination he says that, when Utz told her to get the deed to be executed, she got the keys out of Utz's pocket, and opened some drawer or trunk, and got it. The other testimony on the point is conclusive that Utz carried his own keys, gave out the provisions for his employees, and that appellee cooked and washed, and had nothing to do with the house, except to clean up Utz's room. The next morning after Utz died, the appellee said to Mrs. Utz and Mrs. Hannah, nieces of William Utz, who were then at his house, that she had made a narrow escape : "Mars William deeded me that poor piece of land the day before he died, and, if I had waited until to-day, I would not have had anything at all." She then requested Mrs. Utz and Mrs. Hannah (who are, together with Mary J. Hansbrough, an infant, William Utz's heirs at law) to give her the piece of land in front of her house, so as to extend her land out to the macadam road ; and on being told by Mrs. Utz and Mrs. Hannah that they were unable to give her the land, as there

was an infant interested, appellee said that, if they would give their part, she (appellee) would buy the infant's interest. In this connection appellee stated that Utz had paid her up in full to Christmas, saying that her pay was four dollars per month, and wanted to know of Mrs. Hannah what was due her from Christmas. This is not denied by the appellee, but she attempts to explain it away by saying that she did not then know what her rights were; and, on being questioned as to whom she had ever told that she had such a contract with Mr. Utz as she alleged in her bill, she was unable to name a single person to whom she ever told of such a contract till after the death of Utz. She then says that she did not know what her rights were until she talked with a colored lawyer, who told her that, if she resorted to law, she would be entitled to her labor, or words to this effect.

It should be borne in mind that Utz never owned at any time but an undivided half interest in the Waverly farm. While the proof is that Utz said to a number of persons, during his life, that he intended to give appellee a place, it is not shown by any witness that he ever mentioned any bargain or contract by which he was bound to her for any particular piece of property, or for the payment of any money at his death. Eldridge Carter (colored), who had been Utz's foreman on the Waverly farm for 22 years prior to the latter's death, and necessarily thrown with appellee frequently, testifies that, while he heard Utz say that he intended to give her the house and lot where her family was living, he never said at any time how much land he intended to give her with the house, nor did he or appellee ever mention to witness any contract or agreement between them; and witness never heard of the alleged contract by which appellee was to have 25 acres adjoining the house and lot, $10,000, and Utz's household furniture, until after Utz's death. This witness further testifies that appellee told him of the conversation she had with Mrs. Hannah and Mrs. Utz, immediately after it took place, on the morning after Utz's

death, saying that Mrs. Utz had agreed to give her the piece of land between the house and lot conveyed to her and the macadam road, and expressed herself as satisfied.    Mrs. Hannah and other witnesses say that they heard Utz say that he intended to give appellee the place on which he had built the house for her, but did not intend to do so till his death, and this declared purpose on his part was carried out by the execution of the deed which he delivered to the appellee the day before he died.    It is worthy of notice that neither Lewis Daingerfield, at whose house the alleged contract was made, and who, it is also alleged, persuaded appellee to enter into the contract, nor William Tyler, the husband of Sarah Tyler, are examined as witnesses, though both are still living, or were when the depositions in this cause were taken; and it is further noteworthy that it is proven in the record that Lewis Daingerfield bears a good character for truth and veracity.    This alleged contract is testified to by only two of the persons present when it was made, other than appellee herself, viz. John Daingerfield, a boy 13 years old at the time, and Sarah Tyler, the two latter testifying 25 years after the alleged parol contract was made, of which no memoranda was made at the time; and it seems that they had not talked the matter over together, or with any one except appellee, and not with her till the summer before their testimony was given, and they claim to have had very little talk with her about it.    They could remember with remarkable particularity the details of the "bargain," but their memory was not sufficient to recall other incidents or occurrences at the time just as likely to have impressed themselves on their memory as the alleged conversation in which the "bargain" was made.    It is also shown that there is inconsistency in their statements made in the case at bar and those made by them before the jury in the common-law trial; and the only corroboration of this testimony is found in the testimony given by the witness Ben Sims, whose statement is so highly improbable, and so much at variance with the conduct and declarations of appellee at a time when, from the

nature of the contract she is suing to enforce, she would not have refrained from telling about it, that it is unworthy, we think, of consideration. The conduct of the appellee in her efforts to secure testimony to sustain this claim against the estate of Utz, never mentioned to any one, so far as the proof shows, till after his lips are sealed, is far from being calculated to give credit to her story, or to the testimony adduced in support of it. One of her own witnesses says that she said to him that she would give him $100, if he knew anything that would do her any good. Another says that she told him: "If you will come up, and do what you can for me, you will never lose anything. You will get the best pay you ever got." This witness was summoned in the common-law case, but was not examined. In the various conversations with Utz testified to, and in which he expressed his purpose to give appellee the house and lot at his death, saying that he was her father, not one word was said as to any contract of the character attempted to be set up here, and no intimation whatever of any agreement to make any provision for her, other than that he made by the deed delivered to her the day before his death, and which she accepted without a word to indicate that she had any further claim upon him,—on the contrary, congratulating herself the next day for having gotten her deed, which she said she would not have gotten, had she waited another day, and would not have had anything.

If it be a fact that appellee is the natural child of the decedent, Utz, under the policy of our law, it adds nothing to the strength of her claim asserted in this suit, however persuasive it may be in considering the probabilities that the alleged contract was in fact entered into. It would seem that, if Utz designed to make any such provision for appellee as the alleged contract embodied, he would have made it by a writing duly executed, or would have had it witnessed by reliable persons of intelligence, at least, and would not have contented himself with the loose declarations that have been testified to as having

been made at the house of the colored man Daingerfield, only spoken of by him (Utz) during the remainder of his life of 23 years to the colored man Ben Sims, whom he casually fell in with while walking from the depot homeward on the night of his return from Culpeper with the appellee.    Surely, if such a contract was made, in the 25 years that elapsed from its date to the taking of the depositions in this cause, some proof of it of a more satisfactory character could have been obtained.    Upon reason and authority, the evidence relied on to establish such a contract as is here sought to be enforced should be clear and satisfactory.    It is, we think, far from being of this character, while, to say nothing of the improbabilities that such a contract was ever entered into, the preponderance of the testimony is decidedly against its existence.    We are therefore of opinion that the decree appealed from is erroneous and should be reversed, and this court will enter such decree as the court below should have entered, dismissing appellee's bill, with costs to the appellants.